# UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | | |
|---|---|---|
| **MARK HENDERSON,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **No. 2:10-cv-68-DBH** |
| | ) | |
| **ATLANTIC PELAGIC** | ) | |
| **SEAFOOD, LLC,** | ) | |
| | ) | |
| **Defendant** | ) | |

## AMENDED[1]  RECOMMENDED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON MOTION FOR DEFAULT JUDGMENT

Plaintiff Mark Henderson moves pursuant to Federal Rule of Civil Procedure 55(b)(2)(B) for a default judgment against defendant Atlantic Pelagic Seafood, LLC ("APS") as to all three counts of his complaint, pursuant to which he seeks damages on theories of negligence under the Jones Act, 46 U.S.C. § 30104 (Count I), unseaworthiness (Count II), and maintenance and cure (Count III).  *See* Plaintiff's Motion for Damages Hearing and Entry of Default Judgment ("Motion") (Docket No. 14) at 1-2; Complaint (Docket No. 1) ¶¶ 8-10.

Following Henderson's filing of the instant motion, APS moved to set aside a default that had been entered against it on June 22, 2010, and to file a late answer.  *See* Docket Nos. 12-13, 26.  By decision dated December 9, 2010, that motion was denied.  *See* Docket No. 43.  Henderson requested, and I deemed appropriate, the holding of a hearing to determine damages.  *See* Motion at 2-3; *see also, e.g., KPS & Assocs., Inc. v. Designs by FMC, Inc.*, 318 F.3d 1, 19 (1st Cir. 2003) ("While a default . . . constitutes an admission of liability, the quantum of damages remains to be established by proof unless the amount is susceptible of mathematical

---

[1] The amendments to this recommended decision consist solely of four corrections of the date February 11, 2010, to February 11, 2011.

computation.") (citation and internal punctuation omitted); *In re Home Rests., Inc*., 285 F.3d 111, 114 (1st Cir. 2002) ("A hearing may be required . . . to set damages when the amount is in dispute or is not ascertainable from the pleadings.").

On February 11, 2011, following notice to APS, I held a hearing at which both Henderson and APS appeared, each represented by counsel. Henderson called one witness, himself, presented the videotaped deposition testimony of Stephen P. Beals, M.D., and read into the record the deposition testimony of Stuart Sugarman, M.D. APS called one witness, economist Peter K. Ashton. Henderson offered eight exhibits, six of which were admitted over objection and two without objection, APS offered seven exhibits, all of which were admitted without objection, and the parties offered one joint exhibit, a stipulation. Following the close of the evidence, I heard oral argument from both sides and permitted the filing of simultaneous post-hearing briefs on the question of whether the plaintiff was entitled to damages for lost earning capacity. Those briefs were duly filed. *See* Plaintiff's Memorandum on Economic Loss Issue ("Plaintiff's Post-Hearing Brief") (Docket No. 60); Defendant [Atlantic] Pelagic Seafood LLC's Post Hearing Brief on Lost Earnings ("Defendant's Post-Hearing Brief") (Docket No. 61). With the benefit of the testimony, exhibits, oral argument at hearing, and post-hearing memoranda, I recommend that the court adopt the following proposed findings of fact and conclusions of law, grant the Motion, and award damages in the total amount of $415,570.19.

## I. Proposed Findings of Fact

1.     Mark Henderson was born in Arizona on August 8, 1977. Hearing Testimony of Mark Henderson ("Henderson Test."). He grew up in Arizona and attended Northern Arizona University, from which he received a bachelor's degree of science in electronic media production in 2003. *Id*.

2.     After his graduation from college, Henderson alternated seasonal work in the fishing industry in Alaska, either as a roe technician during herring season or as a deckhand during salmon season, with work as a lift operator at a mountain resort in Jackson Hole, Wyoming, where he resided. *Id.* Henderson has a passion for outdoor activities, including snowboarding, mountaineering, camping, rafting, and back-country hiking. *Id.*

3.     Through his contacts in the fishing industry, Henderson became aware of a job opening on the fishing vessel the F/V *American Freedom*, operated by APS, for which he applied and was hired. *Id.* He initially boarded the vessel in Norway in September or October 2006, with a work schedule entailing two months onboard and two months off. *Id.*

4.     APS is a domestic corporation that at all times relevant to this action did business in the State of Maine, owned and operated the F/V *American Freedom*, and employed Henderson as a crewman aboard that vessel. Complaint ¶ 2.[2]

5.     On February 23, 2007, while Henderson was working his second two-month shift aboard the F/V *American Freedom*, he was struck on the back of the head by a heavy steel hatch door as he attempted to descend a ladder into a ship's hold during a storm. Henderson Test.; Exh. 2 to Deposition of Stephen P. Beals, M.D. ("Beals Dep.") (Plaintiff's Exh. 1) (February 28, 2007, note of Dr. Beals). The force of the blow threw Henderson facedown into the hatch coaming, and the door closed on his head.[3] Henderson Test. His head was pinned between the door and the coaming, with his feet dangling beneath him. *Id.*

6.     Henderson was rendered either momentarily unconscious or dazed, but when he came to, he realized that he had to get his feet back onto the ladder rungs to save himself. *Id.* He

---

[2] The default of APS obliges the court to accept all well-pleaded allegations of Henderson's complaint as true. *See, e.g., Home Rests.*, 285 F.3d at 114.
[3] A "coaming" is "[a] raised curb or rim around an opening, as in a ship's deck, designed to keep out water." Webster's II New Riverside Univ. Dictionary 275 (1994).

managed to get his feet on the rungs, extricate himself by lifting the heavy steel hatch door off of his head, and climb down the ladder. *Id*. He remembers little of what then transpired, other than that he was bleeding profusely and consciously decided to seek out the captain rather than his crew so as to spare them the shock of seeing him. *Id*.

7.     Henderson was airlifted from the F/V *American Freedom* to Southampton Hospital in Southampton, New York, where he was admitted and clinically evaluated. *Id*. Films taken at Southampton Hospital revealed multiple facial fractures throughout his midface area, both horizontally and vertically, as well as zygomatic arch (cheekbone) fractures. Beals Dep. at 11. Henderson was flown to Phoenix, Arizona, to permit treatment and recovery in a location near his parents. Henderson Test.

8.     Henderson was injured while in the course of performing his duties as a crewman aboard the F/V *American Freedom*. Complaint ¶ 7. Employees and/or agents of APS failed to service, maintain, repair, secure, or warn of the hatch cover that closed on Henderson's head. *Id*. ¶ 8.

9.     On February 28, 2007, five days after the accident, Henderson was examined by craniofacial plastic surgeon Stephen P. Beals, M.D., of Phoenix, Arizona. Beals Dep. at 5, 9; Exh. 2 to Beals Dep. (February 28, 2007, note of Dr. Beals). Henderson presented with midface pain and swelling, was black and blue, had some nasal obstruction, could not breathe well, had misaligned teeth, and had some double vision. Beals Dep. at 10. He had sustained his most severe injuries in the midface region. *Id*. at 9. Dr. Beals diagnosed him with a LeFort II fracture in multiple pieces, and malocclusion. *Id*. at 12; Exh. 2 to Beals Dep. (February 28, 2007, note of Dr. Beals). As the LeFort II fracture was described by Dr. Beals:

> The fractures occurred across the bridge of the nose at the base of the skull, and continued down through the eye socket on both sides, and continued down behind

the maxilla, which is the midface bone or the upper jaw on both sides. There [was] a specially severe fracture across the left zygomatic or cheekbone area . . . . And he was also split not exactly down the middle, but down close to the middle of the jaw as well vertically. And his arches on both sides were also broken, though they were minimally displaced and didn't require separate treatment. And as a result then his jaw, . . . which contains his teeth of his upper arch[,] was tilted in a way that his jaw and his teeth did not come together.

*Id*. at 11-12. Henderson's malocclusion, or misaligned bite, caused his teeth to touch only in the back but not in the front, as a result of which he could not chew and could not speak well. *Id*. at 12, 19. The injuries diagnosed by Dr. Beals were all caused by the accident. *Id*. at 13.

10. On March 6, 2007, Dr. Beals performed surgery on the plaintiff to reposition displaced fractured facial bones and fix them in place with plates and screws. *Id*.; Exh. 2 to Beals Dep. (March 6, 2007, St. Joseph's Hospital and Medical Center operative note of Dr. Beals). Dr. Beals continued to see Henderson periodically and had seen and assessed him as recently as May 19, 2010. Beals Dep. at 15-16.

11. Henderson gradually healed following his surgery and had an uncomplicated postoperative course. *Id*. at 15. His fractures healed well, and his occlusion was corrected. *Id*. As a result of the surgery, he has plates and screws on the inner aspect of his cheek next to his nasal cavity, a plate just above his teeth at the floor of his nose, and another plate on the opposite side of the inner aspect of the cheek and nasal cavity. *Id*. at 14-15. The plate at the floor of Henderson's nose was required because his fractures had split apart his palate between his right central incisor and canine. *Id*. at 21.

12. Following his surgery, Henderson was laid up at his parents' house for two months. Henderson Test. He described this as a "horrible" time, during which he lay in bed with his mouth wired shut, was fed puree, and was maintained on pain-blocking drugs. *Id*. During that time Henderson, who is six feet three inches tall, lost 20 pounds, and his weight

dropped to 148 pounds. *Id.*; *see also* Exh. 3 to Deposition of Mandeep Vermani, DDS ("Vermani Dep.") (Plaintiff's Exh. 4) (October 25, 2007, note of Marcia Mastrin, M.D.).

13.     At the end of this two-month recovery period, Henderson pushed himself to get back to work quickly. Henderson Test. In May 2007, he returned to his three-week-long seasonal job as a roe technician on a herring tender in Alaska, a job he found relatively easy. *Id.* He performed the seasonal roe technician job in Alaska again in 2008 and 2009, the deckhand job during salmon season in 2010, and has also worked in Jackson Hole, Wyoming, at a ski mountain resort and at a Mexican restaurant, since his accident. *Id.* He supported himself through his own earnings in both 2009 and 2010. *Id.*

14.     In the spring of 2010, Henderson enrolled as a student in a certified nursing assistant program at Central Wyoming College in Jackson Hole. *Id.*; *see also* Deposition of Mark Henderson ("Henderson Dep.") (Defendant's Exh. 4) at 30. He felt that he needed a shift in focus in his life after his accident and was inspired to pursue nursing by the excellent and compassionate nursing care that he received after his accident and on another occasion, subsequent to his accident, when he became acutely ill during a monthlong trip to Guatemala with his girlfriend. Henderson Test. He became passionate about the idea of becoming a registered nurse and giving back to the community, including possibly some day volunteering for Doctors Without Borders. *Id.* He is driven to succeed in his quest to become a registered nurse and often works at his studies from 8 a.m. to 11 p.m. *Id.*

15.     As of the hearing date, Henderson remained enrolled in the certified nursing assistant program at Central Wyoming College and was taking an English class in preparation for enrollment in a registered nurse, or R.N., studies program. *Id.* He planned to apply in March 2011 for admission to an associate's degree R.N. program offered by Central Wyoming College

as well as to an accelerated bachelor's degree R.N. program offered by the University of Wyoming. *Id*. He preferred to attend the Central Wyoming College program, but if he were to attend and complete either program, he would become a registered nurse in 2013. *Id*. As of the hearing date, Henderson was also working as a waiter at a Mexican restaurant in Jackson Hole three nights a week, on Friday, Saturday, and Sunday. *Id*.

16. Henderson has received excellent grades at Central Wyoming College, most recently obtaining straight As. *Id*. However, he feels that he has had to work twice as hard as he did before his accident to achieve at that level. *Id*.

17. Henderson was a healthy and active young person prior to his accident, with no physical or mental impairments. *Id*. He has a strong desire to progress and continue his active lifestyle despite the residual effects of his accident. *Id*. Since the accident, he has continued to engage in the outdoor activities that he loves, including advanced snowboarding and back-country hiking, although he has had to take breaks because of back pain. *Id*. He has had a season's pass to the Jackson Hole ski resort for the past five years. *Id*.

18. Despite his post-accident activities and achievements since the accident, Henderson has suffered well-documented accident-related residual physical and mental symptoms and is expected to continue to suffer some level of ongoing symptomatology for the rest of his life. These residual symptoms include:

A. *Severe neck and back pain*, of which Henderson became aware after ceasing pain medication at the end of his initial two-month recovery period. *Id*. He sought treatment for that pain at an Arizona pain clinic from October through December 2007 and testified that he would seek out chiropractic and acupuncture treatment for this ongoing pain if he could afford to do so.

*Id.*; Exh. 3 to Vermani Dep. (notes dated October 25, 2007, through December 6, 2007, of Dr. Mastrin and Peter Himler, P.T., of Arizona Pain Treatment Center).[4]

B.    *Shooting pains and numbness in his face.*  Henderson's lip is flattened and has lost volume, and he suffers from shooting facial pain that sometimes is almost seizure-like as well as from facial numbness.  Henderson Test.  As of May 19, 2010, Henderson continued to complain to Dr. Beals of facial pain and numbness.  Beals Dep. at 16.  Dr. Beals offered surgery to remove the plates and screws in case they were contributing to Henderson's midface symptoms.  *Id.* at 17.  Henderson would seek acupuncture or other treatment for his facial pain if he could afford it.  Henderson Test.  In Dr. Beals' opinion, Henderson's midface pain, shooting pain, numbness, and issues with the plates are a direct result of his accident and are permanent in nature.  Beals Dep. at 16-18.

C.    *Ongoing problems with a sunken left eye.*  Henderson's left eyeball is set too far back in its orbit and his eyelid droops, particularly when he is tired, affecting both his appearance and his vision.  Henderson Test.  His vision is affected not only by the drooping eyelid but also by "flashers and floaters," flashes of lights and specks, none of which he experienced prior to his accident.  *Id.*  Dr. Beals has diagnosed the left eye condition as enophthalmos left globe, directly related to Henderson's orbital asymmetry resulting from the fracture.  Plaintiff's Exh. 15.[5]  As of May 19, 2010, Henderson continued to complain to Beals of flashing lights in his vision from time to time and a left eye that was sunken in comparison to his right, sometimes obstructing his vision, particularly when he was fatigued and his brow dropped and hooded his eye.  Beals Dep. at 16.  Dr. Beals has offered to perform a left eye socket reconstruction and has recommended

---

[4] Dr. Mastrin diagnosed Henderson with cervicalgia, cervicogenic headache, lumbago, and muscle spasm.  *See* Exh. 3 to Vermani Dep. (October 25, 2007, note of Dr. Mastrin).

[5] "Enophthalmos" is "recession of the eyeball within the orbit."  Stedman's Medical Dictionary 596 (27th ed. 2000).

that Henderson continue to follow up with an ophthalmologist for evaluation of his flashing-light feelings and symptoms. *Id*. at 17. In Dr. Beals' opinion, Henderson's left eye socket issues are a direct result of his accident and are permanent in nature. *Id*. at 16-18. Henderson would undergo left eye socket surgery if he could afford it. Henderson Test.

D. *Gum pain and problems with teeth* that were broken in the accident and have been treated with crowns that have failed and have had to be redone. Henderson Test.

E. *Clicking and pain in his jaw*.

i. In June 2008, Dr. Beals recommended that Henderson see a temporomandibular joint ("TMJ") specialist to address ongoing TMJ pain. Beals Dep. at 15.[6] On August 29, 2008, Henderson consulted Dr. Mandeep Vermani, a dentist and diplomate of the American Board of Orofacial Pain. Vermani Dep. at 5-6. He complained not only of TMJ symptoms but also of memory loss, emotional upset, nervousness, depression, stress, difficulty sleeping, insomnia, low energy, fainting spells, dizziness, and backaches. *Id*. at 8. In Dr. Vermani's opinion, Henderson's reported symptoms were consistent with the mechanism of the injury that he had sustained. *Id*. at 9.

ii. With the benefit of dental x-rays and review of the records of the Arizona Pain Treatment Center, which had treated Henderson for neck and back pain, *id*. at 9, 11-12, Dr. Vermani diagnosed capsulitis of the right and left joint, TMJ, right and left facial myalgia, temporalis tendinitis, and cervical strain, *id*. at 13. In her opinion, these diagnoses were related to the plaintiff's accident. *Id*.

iii. Dr. Vermani recommended a removable oral orthotic device to stabilize Henderson's jaw joints and his muscle, the use of heat/ice, and a soft diet, and prescribed

---

[6] A CT scan taken on January 30, 2008, revealed degenerative TMJ changes bilaterally, right greater than the left. Exh. 2 to Beals Dep. (February 1, 2008, maxillofacial CT scan interpretation of Robert Berlin, M.D.).

Naproxen and Norco for pain and Flexeril, a muscle relaxant. *Id*. She also recommended physical therapy for his cervical strain and biofeedback for his stress. *Id*. at 14.

iv.     Dr. Vermani saw Henderson again in May 2010, at which time he reported that he was still having daily jaw pain, popping that was worse when he chewed, and locking, as well as constant neck pain and ringing in his ears. *Id*. at 14-15. In Dr. Vermani's opinion, these symptoms were related to the accident. *Id*. at 15. She recommended that Henderson obtain two new oral appliances, one to wear at night to avoid locking and one to wear during the day to take the pressure off of his joints, and that he apply an anti-inflammatory patch to his jaw. *Id*. at 15-16. Henderson obtained the new appliances from Dr. Vermani on June 23, 2010. *Id*. at 16. At a visit on July 28, 2010, he reported that he was feeling better but still had fatigue in his jaw when chewing and some neck pain two days per week. *Id*. at 16-17. Dr. Vermani felt that Henderson had not reached maximum medical improvement and still could benefit from additional treatment. *Id*. at 17-18.

F.     *Cognitive difficulties and depression*.

i.     Henderson noticed cognitive difficulties immediately after his injury, but they became particularly troubling when he enrolled at Central Wyoming College and encountered difficulties focusing, concentrating, and paying attention. Henderson Test. Henderson found it necessary to devote extra time to his studies to compensate for memory loss as well as for headaches that required him to take frequent breaks. *Id*.

ii.     Henderson had considered himself an intelligent person and had never experienced memory loss prior to his accident. *Id*. Now he must write himself notes on a regular basis as reminders, and it recently took him four-and-a-half hours to write a one-and-a-half page English paper. *Id*. In addition, whereas when Henderson was a university student

10

prior to his accident, he was able to go to school full time plus work, he can now only attend school half time and work. *Id.* Henderson's cognitive difficulties, particularly his memory loss, have caused him significant frustration and sadness, sometimes reducing him to tears. *Id.* Henderson also is depressed by the combination of his physical and cognitive impairments and the stress of school. *Id.* Before the accident, Henderson suffered no depression or other emotional problems and never sought psychiatric or psychological counseling of any kind. *Id.*

iii.    In March 2010, at the referral of his lawyer, Henderson underwent a neuropsychological examination by a psychologist, Dr. Philip Morse, in Portland, Maine. *Id.*; *see also* Exh. 3 to Deposition of Stuart Sugarman, MD ("Sugarman Dep.") (Outpatient Neuropsychological Evaluation of Philip Morse, Ph.D.) at 1. Dr. Morse assessed Henderson as having suffered a mild traumatic brain injury/postconcussive injury related to his accident. Exh. 3 to Sugarman Dep. at 14. He noted: "changes in his physical functioning (taste, smell, vision), as well as cognition (attention, short-term memory functioning, language/word-finding difficulties, motor control/sequencing abilities, short-term memory abilities) and emotional functioning (depressed and anxious mood) are all consistent with sequelae of a mild traumatic brain injury." *Id.*

iv.    Dr. Morse recommended (i) referral to a psychiatrist familiar with traumatic brain injury or other neurological disorders, which would be important not only for prescribing medication for his mood disorders but also for ruling out the possibility of hypomania or a manic component to his depression, (ii) treatment by a psychologist familiar with traumatic brain injury, with Henderson possibly being a very good candidate for cognitive-behavioral therapy to help teach him strategies for managing his mood, (iii) a combination of cognitive rehabilitation exercises and possible medication to treat his difficulties with attention, (iv) creation of a

memory organizing system to keep track of information that he needs to remember, for example, use of a tape recorder or note taker in the classroom and the allowance of extra time for testing, and (v) treatment with a speech and language therapist to learn strategies for managing his word-finding difficulties, auditory processing difficulties, and general difficulties with verbal expression. *Id*. at 15-16.

v.     On April 26, 2010, Henderson sought treatment from Dr. Stuart Sugarman, a psychiatrist based in Jackson Hole, Wyoming.  Sugarman Dep. at 6.  As of the time of Dr. Sugarman's deposition on September 9, 2010, he had seen Henderson on three occasions. *Id*. at 19-20.

vi.     Henderson presented with complaints of cognitive symptoms, particularly difficulty with attention and focus as well as with memory retention, and mood symptoms, primarily low-level ongoing depression, frustration, and irritability. *Id*. at 6-7.  He told Dr. Sugarman that his cognitive and mood problems had begun soon after the accident in 2007. *Id*. at 7.  Dr. Sugarman assessed Henderson as suffering from depression and cognitive problems secondary to the accident, including attention, memory, and perceptual problems. *Id*. at 9-10.[7] He perceived Henderson as being in a negative feedback cycle: his traumatic injury caused difficulties with work, school, and his social life, which in turn caused more depression and frustration. *Id*. at 11-12.  While, in Dr. Sugarman's opinion, Henderson has a lot of strengths, "it's as if he is carrying . . . a big sack of potatoes on his back all of the time in terms of the limitations, the vulnerabilities, . . . from the brain trauma from the accident." *Id*. at 12-13.

_____

[7] Dr. Morse questioned whether Henderson had preexisting attention deficit disorder that was exacerbated by the accident, but after conducting clinical interviews, including with Henderson's mother, Dr. Sugarman concluded that he had not had any such underlying disorder. *See* Sugarman Dep. at 15-16.

vii.     Dr. Sugarman has recommended medications for Henderson for attentional difficulties, depression, and chronic pain.  *Id*. at 15.  He prescribed psychostimulants for Henderson's attentional difficulties, *id*., which Henderson continues to take to the extent that he can remember to do so, Henderson Test., but, as of the time of Dr. Sugarman's deposition, Henderson was reluctant to take antidepressants and did not feel that he could afford medication for chronic pain, Sugarman Dep. at 15.

viii.     Dr. Sugarman agrees with Dr. Morse's treatment recommendations, which are consistent with a generally-accepted multidimensional protocol for treating traumatic brain injury.  *Id*. at 13-14.  In Dr. Sugarman's opinion, if Henderson does not receive the support of regular treatment of the kind recommended, he will have ongoing significant difficulty in work, school, and in his social life despite his considerable strengths.  *Id*. at 14-15.  While, in Dr. Sugarman's opinion, with optimal treatment, Henderson could recover from half to three-quarters of his preexisting mental health, he will have limitations from the traumatic brain injury for the remainder of his life.  *Id*. at 17-18.

ix.     In Dr. Sugarman's opinion, Henderson's cognitive and mood difficulties could make it very difficult for him to stay employed and probably limit in from getting maximum monetary recompense from his work.  *Id*. at 18.  Dr. Sugarman questioned whether Henderson could even complete nursing school and stated that, if he succeeded in doing so, it was very unlikely that he would be able to ascend to the highest levels of nursing practice, which demands cognitive skills that Dr. Sugarman believes Henderson has lost forever because of the accident.  *Id*. at 18-19.  Dr. Sugarman testified that it was hard to know how far Henderson could go with optimal treatment, but, "no matter what, he is going to have a glass ceiling and he is going to be

limited." *Id*. at 19. Dr. Sugarman's opinions are stated to a reasonable degree of medical probability. *Id*. at 20-21.

      x.     As of the time of his hearing, Henderson was not in ongoing treatment with Dr. Sugarman because he could not afford it. Henderson Test. He would continue it if he could afford it. *Id*.

      19.     Henderson's economics expert, Robert A. Strong, Ph.D., calculated the present value of Henderson's lost future earnings based on three possible future earnings scenarios. Telephonic Deposition of Robert A. Strong, Ph.D. ("Strong Dep.") (Plaintiff's Exh. 5) at 8-10; Strong report dated September 23, 2010 ("Strong Report") (Plaintiff's Exh. 6). In the "base scenario," in which Dr. Strong was asked to assume that Henderson would continue the same types of employment in which he was engaged through the time of his accident, Dr. Strong calculated the present value of Henderson's future earnings as $996,829.00. Strong Dep. at 10-11. In the second scenario, in which Dr. Strong was asked to assume that Henderson would become a registered nurse in 2013 but only achieve earnings in the lower half of registered nurse earnings nationwide, he calculated the present value of Henderson's future earnings as $1,174,324.00. *Id*. at 11. In the third scenario, in which Dr. Strong was asked to assume that Henderson would become a registered nurse in 2013 and achieve earnings in the upper half of registered nurse earnings nationwide, he calculated the present value of Henderson's future earnings as $1,567,751.00. *Id*. The difference between the base scenario and the second scenario is $177,495.00. *Id*. at 13. The difference between the base scenario and the third scenario is $570,922.00. *Id*. at 12. The difference between the second and third scenarios is $393,427.00. *Id*. at 13.

20.     According to APS's economics expert, Peter K. Ashton, Dr. Strong's own numbers reveal that there is no lost earning capacity because the appropriate measure of such lost capacity is the difference between pre-injury earnings and projected post-injury earnings, and in all three of Dr. Strong's scenarios, there is no loss in earnings. Testimony of Peter K. Ashton.

21.     Henderson seeks, as damages, (i) unpaid cure (medical bills) in the amount of $7,670.19, (ii) maintenance totaling $7,900.00 for the period from April 1, 2010, through February 11, 2011 (316 days times $25 per day), (iii) lost earnings of either $177,495.00, $393,427.00, or $570,922.00, depending on the future earning scenario the court finds most likely, and (iv) damages to compensate for pain and suffering and mental anguish. Plaintiff's Prehearing Memorandum ("Plaintiff's Pre-Hearing Brief") (Docket No. 56) at [4]. Henderson stipulates that he is not seeking any damages not referenced and set out in his pretrial memorandum, including attorney fees and punitive damages or any maintenance in this action not falling within the dates of April 1, 2010, to February 11, 2011. *See* Stipulation (Joint Exh. 1). Whether or not any maintenance and cure benefits are owing to Henderson because of accident-related medical treatment taking place after February 11, 2011, is not at issue in this action, and the parties reserve any and all rights and defenses with respect to any such claims. *Id*.

22.     APS does not contest the reasonableness of the $7,670.19 in special damages sought, or that those amounts have not been paid. *Id*. The parties agree that in this action the contract maintenance fee is $25.00 per day. *Id*.

## II. Proposed Conclusions of Law

1.     Henderson brings three claims against APS: a Jones Act claim (Count I), an unseaworthiness claim (Count II), and a claim for any maintenance and cure owing as of the time

of trial (Count III). *See* Complaint ¶¶ 8-10. He acknowledges that the damages he seeks pursuant to Counts I and II are identical, *see* Plaintiff's Pre-Hearing Brief at [2], and clarified during a prehearing conference with counsel that he did not press a claim for damages pursuant to Count II. Hence, I confine analysis of the recoverability of those damages to Count I, the Jones Act claim.

2.     "The Jones Act provides seamen with an action for damages at law where an employer's failure to exercise reasonable care causes a subsequent injury even where the employer's negligence did not render the ship unseaworthy." *Poulis-Minott v. Smith*, 388 F.3d 354, 366 (1st Cir. 2004) (citations and internal quotation marks omitted). "In contrast to unseaworthiness, a negligence claim under the Jones Act requires a lesser degree of causation: A plaintiff's burden of proving causation under the Jones Act is featherweight. Liability, therefore, exists if the employer's negligence contributed even in the slightest to the plaintiff's injury." *Id*. (citations and internal punctuation omitted).

3.     "Maintenance and cure is the traditional form of compensation paid to a seaman who becomes ill or injured aboard a vessel." *Whitman v. Miles*, 387 F.3d 68, 71 (1st Cir. 2004) (citations and internal quotation marks omitted). "The duty of paying maintenance and cure falls to the owner of the vessel." *Id.* (citations and internal quotation marks omitted). "The term refers to the provision of, or payment for, food and lodging ('maintenance') as well as any necessary health-care expenses ('cure') incurred during the period of recovery from an injury or malady." *Id*. (citations and internal quotation marks omitted). "The right to maintenance and cure applies only to 'seamen' who are injured or fall ill while 'in service of the ship.'" *Id*. at 71-72 (citation and internal quotation marks omitted).

4. The right to maintenance and cure "applies until the seaman is so far cured as possible." *Id.* (citations and internal quotation marks omitted). "When a seaman's condition has stabilized and further progress ended short of a full recovery, the seaman is no longer entitled to maintenance and cure." *Id.* (citation and internal punctuation omitted). "This point in time is known as the seaman's 'maximum medical recovery.'" *Id.* (citations and internal punctuation omitted). "However, treatment that is more than simply palliative, and would improve the seaman's medical condition[,] is enough to support an award of maintenance and cure in aid of permanent improvement short of a complete cure." *Id.* (citations and internal punctuation omitted). *See also, e.g., Clauson v. Smith*, 823 F.2d 660, 661 n.1 (1st Cir. 1987) ("Maintenance and cure are ongoing. The obligation continues to vest until the incapacity is, from a medical standpoint, declared permanent (and an optimum cure effected). Although the doctrine of laches applies, serial suits are permitted to collect benefits as they accrue.") (citations omitted).

5. "Before [a] plaintiff can recover maintenance and cure, he bears the burden of alleging and proving the following facts: (a) his engagement as a seaman, (b) that his illness or injury occurred, was aggravated or manifested itself while in the ship's service, (c) the wages to which he may be entitled, and (d) the expenditures or liability incurred by him for medicines, nursing care, board and lodging. *Badeaux v. Magnolia Fleet, L.L.C.*, Civil Action No. 10-2697, 2011 WL 765781, at *8 (E.D. La. Feb. 25, 2011) (citations omitted). "However, this burden of proof is light, and the Court resolves ambiguities and doubts in the seaman's favor." *Id.* (citations omitted).

6. The entry on June 22, 2010, of a default against APS, together with the well-pleaded allegations of the complaint and the evidence adduced at hearing, establish its liability to Henderson on the Jones Act and maintenance and cure claims. *See, e.g.*, *Home Rests.*, 285 F.3d

at 114 ("There is no question that, default having been entered, each of plaintiff's allegations of fact must be taken as true and each of its claims must be considered established as a matter of law.") (citation and internal punctuation omitted).

7.     Henderson's allegations that APS was his employer at all relevant times and that its employees and/or agents failed to service, maintain, repair, secure, or warn of the hatch cover that closed on his head, thereby causing severe injuries, Complaint ¶¶ 2, 7-8, suffice to establish its liability pursuant to the Jones Act.

8.     Henderson's allegations that APS was the owner of the vessel aboard which he was injured while in the course of performing his duties as a crew member, *id.* ¶¶ 3, 7, together with his testimony regarding the circumstances of the accident and the parties' stipulations as to the contract rate for maintenance and the total amount of unpaid cure, establish APS's liability to Henderson for maintenance and cure.

9.     During oral argument following the close of the evidentiary portion of the damages hearing, counsel debated whether APS's default foreclosed it from challenging payment of maintenance and cure on the ground that Henderson had reached maximum medical improvement.  Even assuming *arguendo* that APS can properly mount such a challenge, the evidence as a whole suggests that Henderson has not reached maximum medical improvement and that surgery to reconstruct his eye socket and/or remove the plates and screws implanted in his face, additional treatment for his jaw problem, and additional treatment for his cognitive and depression problems could improve his functioning.[8]

---

[8] In stipulating that it did not contest the reasonableness of the $7,670.19 sought as cure or that those amounts had not been paid, APS reserved "all rights with respect to any obligation it had to pay those amounts, including notice; medical end result; collateral source; setoff, and those defenses enumerated in its pre-trial memorandum." Stipulation.  Assuming *arguendo* that it would have been appropriate, in view of its default, for APS to press any of those points or defenses, the only point pressed during oral argument was that Henderson had reached maximum medical improvement, cutting off his right to maintenance and cure.  Even as to that point, APS withdrew a request (*continued on next page*)

10.     Henderson has demonstrated his entitlement to the requested damages of (i) $7,670.19 in unpaid cure (medical bills) and (ii) $7,900.00 in maintenance, at the contract rate of $25 per day for the period from April 1, 2010, through February 11, 2011 (316 days times $25 per day). I therefore recommend that the court award those sums.

11.     Damages for both pain and suffering and lost earning capacity are recoverable pursuant to the Jones Act. *See, e.g., Stafford v. Perini Corp*., 475 F.2d 507, 512 (1st Cir. 1973).

12.     As compensation for Henderson's pain, suffering, and mental anguish, I recommend that the court award him $400,000.00. Henderson sustained a terrible and painful crush injury to his head and face, in the immediate aftermath of which he could not chew, had double vision, and could speak only with difficulty. He suffered multiple facial fractures, necessitating the placement of plates and screws in his face. He underwent a difficult two-month initial recovery period during which his activities were substantially curtailed, his mouth was wired shut, he lost a substantial amount of weight, and he was maintained on pain-blocking drugs.

Henderson made a remarkable recovery, was able to undertake a seasonal fishing job in Alaska as soon as May 2007, and with determination and persistence, has managed to maintain his active lifestyle, including expert snowboarding and backpacking, to travel, and, thus far, to successfully pursue his dream of becoming a registered nurse. Nonetheless, Henderson suffers, and indefinitely will continue to suffer, emotional and physical pain and cognitive difficulty as a result of the accident.

Physically, Henderson continues to experience ongoing problems with his jaw joints, neck, back, left eye, vision, and teeth, as well as shooting pains and numbness in his face and

to brief the issue.

numbness and a loss of volume in his lips.  While some of these conditions may improve with treatment, for example, further TMJ treatment and left eye reconstruction surgery, he will continue to suffer residual physical symptoms from this accident for the rest of his life.

Henderson suffered a mild traumatic brain injury in the accident and has struggled since then with cognitive difficulties that include memory loss and trouble focusing, concentrating, and paying attention, as well as depression and frustration exacerbated by his physical and cognitive limitations.  Even with optimal treatment, he is not expected to regain his preexisting mental health.  While he has great strengths and evidently remains capable of high achievement, his achievements will come at a higher cost in effort and well-being than they otherwise would have as a result of his traumatic brain injury and the physical residual symptoms of his accident.  He will continually need to compensate for his cognitive impairments, which Dr. Sugarman likened to "carrying . . . a big sack of potatoes on his back all of the time[.]"  Sugarman Dep. at 13.

Henderson was only 29 years old at the time of the accident, and was burdened by none of the foregoing mental or physical health problems, all of which are a direct or indirect result of the accident.  His accident-related problems will impact him on an ongoing basis as he strives to complete nursing school, meet the demands of the registered nursing profession, and continue to engage in the highly active outdoor lifestyle about which he is passionate.  In the totality of the circumstances, the sum of $400,000.00 for the pain, suffering, and emotional anguish that he has experienced and will experience between the time of his injury and the end of his projected work life at age 66, *see* Strong Report at 1, and will experience from that point through the rest of his life, is not excessive compensation.[9]

---

[9] In a previous damages determination case in which I issued a recommended decision, *Rhoades v. Walsh*, Civil No. 08-368-P-H, 2009 WL 2600094 (D. Me. Aug. 19, 2009) (rec. dec., *aff'd* Aug. 25, 2009), I looked to a 2006 law review article by Ronen Avraham, *Putting a Price on Pain-and-Suffering Damages: A Critique of the Current*

(*continued on next page*)

13.     Henderson finally seeks damages for loss of earning capacity.  *See* Plaintiff's Post-Hearing Brief at 4.  APS challenges any such award on two bases: (i) that in accordance with *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523 (1983), and the testimony of its economics expert, Peter Ashton, there can be no lost earnings capacity when a plaintiff's expected post-injury earnings exceed pre-injury earnings, and (ii) even assuming *arguendo* that in such circumstances, a plaintiff could have lost earning capacity, there is no evidentiary basis for either of the post-injury earnings scenarios offered by Dr. Strong.  *See* Defendant's Post-Hearing Brief at 1-5.  Henderson argues that (i) *Jones & Laughlin* contemplates, rather than precluding, damages predicated on an injury-related lost *earning capacity* even if, as a result of a career change, there are no lost *earnings*, and that his expert, Dr. Strong, calculated earnings scenarios in accordance with the dictates of *Jones & Laughlin*.  *See* Plaintiff's Post-Hearing Brief at 2-4.

14.     I agree with APS that, even assuming *arguendo* that the plaintiff's projected higher post-injury than pre-injury earnings would not bar a lost earning capacity award pursuant to *Jones & Laughlin*, he sets forth an insufficient evidentiary basis for the requested award.  It is black-letter law that damages must not be speculative and must rest on an adequate evidentiary foundation.  *See, e.g., Quinones-Pacheco v. American Airlines, Inc.*, 979 F.2d 1, 6-7 (1st Cir. 1992) (holding that district court did not err in excluding expert testimony as to lost earning capacity when the expert's analysis "was predicated on an assumption not supported by the record – the assumption that [the plaintiff] suffered from a permanent, total disability";

_____
*Approaches and a Preliminary Proposal for Change*, 100 Nw. U.L. Rev. 87, 110 (2006), for guidance in calculating non-economic damages, *see Rhoades*, 2009 WL 2600094, at *14 n.26.  Avraham's model is based upon suggested multipliers of past and expected future medical costs associated with an injury.  *See id.*  In this case, no evidence was adduced by either side of Henderson's total past or projected future medical costs.  Hence, I have not relied on the Avraham model in this case.

observing, "In tort actions, loss of earning capacity is an economic concept based upon a medical foundation. A plaintiff has the burden of proving his claimed loss of earning capacity. To do so, he must offer evidence from which a jury may reasonably determine the annualized stream of income that the plaintiff, uninjured, would probably have earned, and contrast it, over the period of proven disability, to a similar forecast of what the injured plaintiff's earnings are likely to be."); *see also, e.g., Boucher v. U.S. Suzuki Motor Corp*., 73 F.3d 18, 21 (2d Cir. 1996) ("Where lost future earnings are at issue, an expert's testimony should be excluded as speculative if it is based on unrealistic assumptions regarding the plaintiff's future employment prospects.").

15.     Despite Henderson's cognitive and affective impairments and Dr. Sugarman's testimony that, as a result of those impairments, it is questionable whether he can even complete his training to become a registered nurse, Henderson has shown, in view of the depth of his determination to become a registered nurse and his excellent performance in school thus far, that he more likely than not will become a registered nurse.

16.     Nonetheless, even accepting Dr. Sugarman's testimony that the plaintiff's accident-related mental impairments will impose a "glass ceiling" on his ability to progress within that profession, Sugarman Dep. at 19, I agree with APS that an award of lost earning capacity damages, specifically, an award of $393,427.00, the differential between the two registered nurse earnings scenarios set forth by Dr. Strong, rests on an inadequate evidentiary foundation.

17.     Dr. Sugarman testified that Henderson's cognitive and mood difficulties "could definitely make it very difficult for him to stay employed and most probably will limit him from getting *maximal monetary recompense* from his work." *Id*. at 18 (emphasis added). He further testified that it was "very unlikely that [Henderson] would be able to ascend to the *highest levels*

of nursing practice as they demand cognitive skills that I think he has lost forever because of the accident[,]" although it was "hard to tell how far he could go with optimal treatment." *Id*. at 19 (emphasis added). He offered no further quantification of the impact of Henderson's mental impairments on his ability to earn wages as a registered nurse.

18.     Extrapolating from Dr. Sugarman's testimony, Henderson's attorney asked Dr. Strong to calculate the present value of Henderson's future earnings losses for two scenarios, one in which Henderson could not become a registered nurse and would instead remained employed in jobs consistent with those in which he earned the wages reported in recent tax returns, and one in which Henderson would become a registered nurse in 2013, but his performance would be such that he would never achieve full wage earning potential and thus always stay in the *bottom half* of the registered nurse wage range nationally. *See* Strong Dep. at 7-9 & Exh. 2 thereto. Dr. Strong never spoke with Henderson, interviewed any of his doctors, or read any transcripts of depositions taken in this case. *See* Strong Dep. at 9-10. He relied solely on the scenarios and facts presented by Henderson's attorney and on tax returns that Henderson's attorney supplied. *See id*. at 10.

19.     In calculating Henderson's wages if he were to remain in the bottom half of the registered nurse range, Dr. Strong assumed that he would earn wages at the 25th percentile, the middle of the lower half. *See id*. at 28. In calculating Henderson's wages if he were to ascend to the top half of the registered nurse range, Dr. Strong assumed that he would start at the 50th percentile and work his way up to the 75th percentile by the time of his retirement. *See id*. Dr. Strong supplied no rationale for the first assumption other than that the 25th percentile was the midpoint in the bottom half of the range. *See id*.; Strong Report at 3. With respect to the second assumption, he explained that he added an annual increment as Henderson's wages rose over his

30-year nursing career from the 50th to the 75th percentile, but supplied no rationale for those choices. *See* Strong Dep. at 28; Strong Report at 4.

20. Insofar as appears, based on Dr. Sugarman's testimony, Henderson's attorney arbitrarily posited a scenario in which his client would remain in the bottom half *versus* the top half of the registered nursing profession. Dr. Sugarman's testimony equally plausibly could have supported lost earning capacity differentials within the upper half of registered nurse earnings, say, the difference between the 50th and the 75th percentiles, the 75th and the 100th percentiles, or even the 90th and the 100th percentiles.[10] In turn, based on Henderson's attorney's posited scenarios, Dr. Strong made further arbitrary or insufficiently explained assumptions, notably, that in the bottom half of the registered nurse earnings range, Henderson's earnings would remain frozen at the 25th percentile, and in the top half, his earnings would grow over time from the 50th to the 75th percentile. The arbitrary assumptions of Dr. Strong, which in turn rested on arbitrary assumptions extrapolated by Henderson's attorney from Dr. Sugarman' testimony, cannot support lost earning capacity damages.

21. It is the plaintiff's burden to prove lost earning capacity damages. *See, e.g., Quinones-Pacheco*, 979 F.2d at 6. Henderson has presented insufficient evidence "from which a finder of fact can estimate, or infer[,] the loss or decrease in earning capacity with reasonable certainty." *Davis v. L.D. Moss*, 841 F. Supp. 1193, 1198 (M.D. Ga. 1994).

### III. Conclusion

For the foregoing reasons, I recommend that the court **GRANT** the Motion and, consistent with the foregoing, enter judgment in favor of Henderson and against APS on Counts I, II, and III of the Complaint and award damages of $400,000.00 to Henderson pursuant to Count I for pain,

---

[10] In this context, it is noteworthy that Henderson has been able, albeit with determined and compensatory effort, to achieve at very high levels in the certified nursing assistant program in which he is currently enrolled.

suffering, and emotional anguish, nothing pursuant to Count II, which seeks damages duplicative of those sought pursuant to Count I,[11] $7,670.19 pursuant to Count III for unpaid cure, and $7,900.00 pursuant to Count III for maintenance for the period from April 1, 2010, through February 11, 2011, for a total award of $415,570.19.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 22nd day of April, 2011.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge

---

[11] *See* section II(1), *supra.*